The following opinion was prepared by Mr Justice Story at February term 1819, and was not delivered; Mr Chief Justice Marshall having delivered the opinion of the court in the case. By his permission it is inserted here, as the principles discussed in the opinion are the same with some of those involved in the case of Inglis *vs.* The Trustees of the Sailor's Snug Harbour, ante, p. 99.

THE TRUSTEES OF THE PHILADELPHIA BAPTIST ASSOCIATION *vs.* SMITH AND ROBERTSON, 4 *Wheat.* 1.

STORY J. Charitable donations were of great consideration in the civil law, and bequests to pious uses were deemed privileged testaments(*a*). There can be little doubt that the authority of the Roman code, combining with the religious notions of former times, contributed in no small degree to engraft the principles of that law respecting charities into the common law. This was manifestly the opinion of lord Thurlow(*b*); and lord Eldon, in assenting to it has added, that, as at an early period the ordinary had authority to apply a portion of every man's estate to charity, when afterwards the statute compelled a distribution, it is not impossible that the same favour should have been extended to charity in the construction of wills, by their own force purporting to authorise such a distribution(*c*). Be this as

(*a*) Swinburne, pl. 1; s. 16, p. 103. Id. pl. 7, s. 8, pl. 908. 2 Domat. 160, 161, 163.

(*b*) White *vs.* White, 1 Bro. Ch. Cas. 12.

(*c*) Moggridge *vs.* Thackwell, 7 Ves. 36, 69. Mills *vs.* Farmer, 1 Merivale. 55, 94.

it may, it cannot be denied that many of the privileges given to charitable testaments by the civil law have been for ages incorporated into the common law. For instance, one privilege was that no such testament was void for uncertainty either as to persons or objects. Hence, if a testator gave his goods to be distributed among the poor, or made the poor his executors, the legacy was not void; although it would have been otherwise, if charity had not been the legatee(*a*). And the same rule has been adopted into the common law, at least ever since the statute of charitable uses(*b*). Indeed, at one period, the constructions in respect to charitable bequests were pushed to a most extravagant length; and the good sense of succeeding times has lamented, and as far as it consistently could, has endeavoured to abridge the ancient doctrine to something like a rational system(*c*). It is now too late to contend that a disposition in favour of charity can be construed according to the rules which are applicable to individuals. In the first place, the same words in a will, when applied to individuals, may require a very different construction, if applied to the case of a charity. If a testator give his property to such person as he shall hereafter name to be his executor, and afterwards appoint no executor; or, if, having appointed an executor, he dies in his life time, and no other is appointed in his place, in either of these cases, as to individuals, the testator must be held intestate, and his next of kin will take the estate. But to give effect to a bequest in favour of charity, chancery will in both instances supply the place of an executor, and carry into effect that which in the case of individuals must have failed altogether(*d*). Again, in the case

(*a*) Swinburne, pl. 1, s. 16, p. 104, 59. 2 Domat. lib. 4, tit. 2, s. 6, p. 161, 162, 163.

(*b*) 43 Eliz. ch. 4.

(*c*) See what is said on this subject in Moggridge *vs.* Thackwell, 1 Ves. Jun. 464. S. C. 7 Ves. 36. Mills *vs.* Farmer, 1 Merivale, 55. Corbyn *vs.* French, 4 Ves. 418. Attorney General *vs.* Minshull, 4 Ves. Jun. 11. Attorney General *vs.* Boultree, 2 Ves. Jun. 380. Attorney General *vs.* Whitchurch, 3 Ves. Jun. 141. Carey *vs.* Abbot, 7 Ves. 490. Attorney General *vs.* Baynes, Prec. Ch. 270.

(*d*) Mills *vs.* Farmer, 1 Merivale, 55, 94. Moggridge *vs.* Thackwell, 7 Ves. 36. Attorney General *vs.* Jackson, 11 Ves. Jun. 365, 367.

of an individual, if an estate is devised to such person as the executor shall name, and no executor is appointed, or one being appointed dies in the testator's life time, and no one is appointed in his place, the bequest amounts to nothing. Yet such a bequest to charity would be good, and the court of chancery would in such case assume the office of executor(*a*). So if a legacy be given to trustees to distribute in charity, and they die in the testator's life time, although the legacy is lapsed at law, (and if they had taken to their own use it would have been gone for ever), yet in equity it will be enforced(*b*). Again, although in carrying into execution a bequest to an individual, the mode in which the legacy is to take effect must be of the substance of the legacy, yet where charity is the legatee, the court will consider it as the whole substance of the bequest; and in such cases only, if the mode fail, will provide a mode by which that legatee shall take, but by which no other than charitable legatees can take(*c*). A still stronger case is, that if the testator has expressed an absolute intention to give a legacy to charitable purposes, but has left uncertain, or to some future act, the mode by which it is to be carried into effect, there the court of chancery, if no mode is pointed out, will of itself supply the defect and enforce the charity(*d*). Therefore it has been held, that if a man devises a sum of money to such charitable uses as he shall direct by a codicil to be annexed to his will, or by a note in writing, and afterwards leaves no direction by note or codicil, the court of chancery hath power to dispose of it to such charitable uses as it shall think fit(*e*). So if a testator bequeath a sum for such a

(*a*) Mills *vs.* Farmer, 1 Merivale, 55, 96. Moggridge *vs.* Thackwell, 7 Ves. 36.

(*b*) Attorney General *vs.* Hickman, 2 Eq. Cas. Abridg. 193. Moggridge *vs.* Thackwell, 3 Bro. Ch. 517. S. C. 1 Ves. Jun. 464. 7 Ves. 36. Mills *vs.* Farmer, 1 Merivale, 55, 100. White *vs.* White, 1 Bro. Ch. 12.

(*c*) Mills *vs.* Farmer, 1 Merivale, 55, 100. Moggridge *vs.* Thackwell, 7 Ves. 36. Attorney General *vs.* Berryman, 1 Dick. R. 168. 2 Roper on Legacies, 130.

(*d*) Mills *vs.* Farmer, 1 Merivale, 55, 95. Moggridge *vs.* Thackwell, 7 Ves. 36. White *vs.* White, 1 Bro. Ch. 12.

(*e*) Attorney General *vs.* Syderfin, 1 Vern. 224. S. C. 2 Freeman, 261, recognized as law in Mills *vs.* Farmer, 1 Merivale, 55, and Moggridge *vs.* Thackwell, 7 Ves. 36, 70, &c.

school as he should appoint, and he appoints none, the court may apply it for what school it pleases(*a*). The doctrine has gone yet farther, and established that if the bequest denote a charitable intention, but the object to which it is to be applied is against the policy of the law, the court will lay hold of the charitable intention, and execute it for the purpose of some charity agreeable to the law, in the room of that contrary to it.(*b*) Thus a sum of money bequeathed to found a Jew's synagogue, has been taken by the court, according to this principle, and transferred to the benefit of a foundling hospital(*c*). And a bequest for the education of poor children in the Roman catholic faith, has been decreed to be disposed of according to the pleasure of the king, under his sign manual(*d*). Another principle equally well established is, that if the bequest be for charity, it matters not how uncertain the objects or persons may be; or whether the bequest can be carried into exact execution or not; or whether the persons who are to take be in esse or not; or whether the legatee be a corporation capable in law to take or not; in all these and the like cases the court will sustain the legacy, and give it effect according to its own principles, and where a literal execution becomes inexpedient or impracticable, will execute it cy pres. Attorney General *vs.* Oglander, 3 Bro. Ch. 166. Attorney General *vs.* Green, 3 Bro. Ch. 492. Freer *vs.* Peacock, Rep. temp. Finch, 245. Attorney General *vs.* Barltree, 2 Ves. Jun. 380. Duke, 108 to 113. Thus a devise of lands to the church wardens of a parish (who are not a corporation capable of taking lands) for a charitable purpose, though void at law, will be sustained in equity(*e*). So if the corporation for whose use it is designed is not in esse, and cannot come into existence,

(*a*) 2 Freeman, 261. Moggridge *vs.* Thackwell, 7 Ves. 36, 73, 74.

(*b*) Da Costa *vs.* De Pas, 1 Vern. R. 248. Moggridge *vs.* Thackwell, 7 Ves. 36, 75. Carey *vs.* Abbot, 7 Ves. 490. Attorney General *vs.* Guire, 2 Vern. 266.

(*c*) Id. and Mills *vs.* Farmer, 1 Merivale, 55, 100:

(*d*) Carey *vs.* Abbot, 7 Ves. 490.

(*e*) 1 Burn's Eccles. Law. 226. Duke, 33, 115. Com. Dig. Chancery, 2, N. 2. Rivett's Case, Moore, 890. Mills *vs.* Farmer, 1 Meriv. 55. Attorney General *vs.* Bowyer, 3 Ves. 714. Wort *vs.* Knight, 1 Ch. Cas. 135. Moggridge *vs.* Thackwell, 7 Ves. 36.

but by some future act of the crown, as for instance, a gift to found a new college, which requires an incorporation, the gift is valid, and the court will execute it(a). So if a devise be to an existing corporation by a misnomer, which makes it void at law(b). So where a devise was to the poor generally, the court decreed it to be executed in favour of three public hospitals in London(c). So a legacy towards establishing a bishop in America was held good, though none was yet appointed(d). And where a charity is so given that there can be no objects, the court will order a different scheme of the charity; but it is otherwise if objects may, though they do not at present exist(e); and when objects cease to exist, the court will new model the charity(f). And in aid of these principles the court will, in all cases of charities, supply all defects in the conveyances, where the donor hath a capacity and a disposable estate, and his mode of donation does not contravene the provisions of any statute(g).

Some of these doctrines may seem strange to us, as they have also seemed to lord Eldon; but he considered the cases too stubborn to be shaken without doing that in effect which no judge will in terms take upon himself, to reverse decisions that have been acted upon for centuries(h).

If, therefore, the present case had arisen in England since the statute of charitable uses, 43 Elizabeth, ch. 4, there can be no doubt that it would have been established as a valid be-

(a) White vs. White, 1 Bro. Ch. 12. Attorney General vs. Downing, Ambler, 550, 571. Attorney General vs. Bowyer, 3 Ves. 714, 727.

(b) Anon. 1 Ch. Cas. 267. Attorney General vs. Platt, Rep. temp. Finch, 221.

(c) Attorney General vs. Peacock, Rep. temp. Finch, 45. Owens vs. Bean, Rep. temp. Finch, 395. Attorney General vs. Syderfin, 1 Vern. 224. Clifford vs. Francis, 1 Freeman 330.

(d) Attorney General vs. Bishop of Chester, 1 Bro. Ch. 444.

(e) Attorney General vs. Oglander, 3 Bro. Ch. 166.

(f) Attorney General vs. City of London, 3 Bro. Ch. 171. S. C. 1 Ves. Jun. 243.

(g) Case of Christ's College, 1 W. Bl. 90. S. C. Ambler, 351. Attorney General vs. Rye, 2 Vern. 453. Rivett's Case, Moore, 890. Attorney General vs. Burdet, 2 Vern. 755. Attorney General vs. Bowyer, 3 Ves. Jun. 714. Mills vs. Farmer, 15 Merivale, 55. Collinson's Case, Hob. 136. Moore. 822.

(h) Moggridge vs. Thackwell, 7 Ves. 36, 87.

quest, notwithstanding it is given to an .unincorporated society(*a*). The only question would have been, whether it ought to· be administered by a scheme under the direction of the court of·chancery, or by the king ·himself, as parens patriæ, under his sign manual. As to this, the rule which has been drawn by lord Eldon, ·from a most learned and critical examination of· all the authorities is, that where there is a bequest to *trustees* for charitable purposes, the disposition must be in chancery, under a scheme to be approved by a master ; but· where the object is charity, ·and *no trust is interposed*, it ·must be by the king,· under his sign manual ; ·for in such cases the king, as parens patriæ, is deemed the constitutional trustee(*b*)·.

But the statute of Elizabeth not being in force in Virginia at the time when the present will took effect, (it having been repealed by the legislature between the making of the will and the death of the testator),· it becomes a material inquiry, how far the jurisdiction and doctrines of the court of chancery respecting charitable uses depends upon that statute, and whether,· independent of it, the present donation can be upheld.

· It is not easy to arrive at any satisfactory conclusion on this head. Few traces remain of the exercise of this jurisdiction in any shape prior to the statute of Elizabeth. ·The principal, if not the only cases now to be found,· were decided in the courts of common law, and turned upon the question, whether the uses were void or not within the statutes against superstitious uses. One of the earliest cases is Porter's case(*c*) ; which was a devise of lands devisable by

(*a*) See also Bayley and Church *vs.* Attorney General, 2 Atk. 239.  Owen *vs.* Bean, Rep. temp. Finch, 395.  S. C. 2 Ventris, 349.  Anon. 1 Ch. Cas. 267. West *vs.* Knight, 1 Ch. Cas. 135.  Mayor, &c. of Reading *vs.* Lane, Duke, 81, and see Bridgman's Duke, 361, 486.

(*b*) Moggridge *vs.* Thackwell, 7 Ves. 36, 86.  Paice *vs.* Archbishop of Canterbury, 14 Ves. 372.  Attorney General *vs.* Herrich, Ambler, 712.  Morice *vs.* Bishop of Durham, 9 Ves. 399.  S. C. 10. Ves. 522, 541.  Clifford *vs.* Francis, 1 Freeman, 330.  Attorney General *vs.* Syderfin, 2 Freeman, 261.  S. C. 1 Vern. 224.  S. C. 7 Ves. 69, 70.  2 Maddock's Ch. 63.  Highmore on Mortm. 250. 1 Bac. Abr. Charitable Uses, (E).  Attorney General *vs.* Mathews, 2 Lev. 167.

(*c*) 1 Co. 22, b, in 34 and 35 Elizabeth.  See also a like decision in Partridge

custom to the testator's wife in fee, upon condition that she should assure the lands devised for the maintenance and continuance of a free school and certain almsmen and almswomen ; and it appeared that the heir had entered for condition broken, and conveyed the same lands to the queen. It was held that the use being for charity, was a good and lawful use, and not void by the statutes against superstitious uses, and that the queen might well hold the land for the charitable uses. - Lord Eldon in commenting on this case has observed, " it does not appear that this court (i. e. chancery) at that period had cognizance upon informations for the establishment of charities. Prior to the time of lord Ellesmere(*a*), as far as the tradition of times immediately following goes, there were no such informations as that upon which I am now sitting (i. e. an information to establish a charity); but they made out their case as well as they could by law"(*b*). So that the result of lord Eldon's researches on this point is, that until about the period of enacting the statute of Elizabeth, bills were not filed in chancery to establish charities ; and it is remarkable that sir Thomas Egerton and lord Coke, who argued Porter's case for the queen, though they cited many antecedent cases, refer to none which were not decided at law. And the doctrine established by Porter's case is, that if a *feoffment* is made to a general legal use, not superstitious, though indefinite, though no person is in esse who could be the cestui que use, yet the *feoffment* is good ; and if the use was bad, the heir of the feoffor would be entitled to enter, the legal estate remaining in him(*c*). The absence therefore of all authority derived from equity decisions ; on an occasion when they would probably have been used, if existing ; certainly does very much favour the conclusion of lord Eldon ; and if we might hazard a conjecture,

---

*vs*. Walker, cited, 4 Co. 116, b.    Martindale *vs*. Martin, Cro. Eliz. 288.    Thetford School, 8 Co. 130.

(*a*) Sir Thomas Egerton was made lord chancellor in 39 Elizabeth, 1596, and was created lord Ellesmere in 1 James I. 1603.

(*b*) Attorney General *vs*. Bowyer, 3 Ves. 714, 726.

(*c*) 3 Ves. Jun. 726.

it would be, that Porter's case having established charitable uses, not superstitious, to be good at law, chancery, in analogy to other cases of trusts, immediately held the *feoffees* to such uses accountable in equity for the due execution of them; and that the inconveniences felt in resorting to this new and anomalous proceeding, from the indefinite nature of some of the uses, gave rise within a very few years to the statute of 43 Elizabeth(*a*). This view would have a great tendency to reconcile the language used on other occasions by other chancellors, in reference to the jurisdiction of chancery over charities, with that of lord Eldon; as it would show that in cases of feoffments to charitable uses, bills to establish those uses might in fact have been introduced by lord Ellesmere about five years before the statute of Elizabeth; which might be quite consistent with the fact that such bills were not sustained where the donation was to charity generally, and no trust was interposed or legal estate devised to support the uses. And it is very certain that at law a devise to charitable uses generally, without interposing a trustee, or a devise to a non-existing corporation, or to an unincorporated society, would have been, and in fact was held, utterly void for want of a person having a sufficient capacity to take as devisee(*b*). The statute of Elizabeth in favour of charitable uses cured this defect(*c*), and provided (as we shall hereafter have occasion more immediately to consider) a new mode of enforcing such uses by a commission under the direction of the court of chancery. Shortly after this statute it became a matter of doubt whether the court could grant relief by original bill in cases within that statute, or was not confined to the remedy by commission. That doubt remained until the reign of Charles II. when it was settled in favour

(*a*) There was in fact an act passed respecting charitable uses in 39 Elizabeth, ch. 9; but it was repealed by the act of 43 Eliz. ch. 4. Com. Dig. Charitable Uses, N, 14.

(*b*) Anon. 1 Chan. Cas. 207. Attorney General *vs.* Tancred, 1 W. Bl. 90. S. C. Ambler, 351. Collinson's Case, Hob. 136. S. C. Moore, 888. Widmore *vs.* Woodroffe, Ambler, 636, 640. Com. Dig. Devise, K.

(*c*) Com. Dig. Charitable Uses, N. 11. Com. Dig. Chancery, 2, N, 10.

of the jurisdiction by original bill(*a*). But on one occasion, in which this very question was argued before him, lord keeper Bridgman declared " that the king, as pater patriæ, may inform for any public benefit *for charitable uses, before the statute of* 30 [43] *of Elizabeth* for charitable uses; but it was doubted the court could not by bill take notice of that statute, so as to grant a relief according to that statute upon a bill(*b*)." On another occasion, soon afterwards, where the devise was to a college, and held void at law by the judges for a misnomer, and on a bill to establish the devise as a charity, the same question was argued; lord keeper Finch (afterwards lord Nottingham) held the devise good as an appointment under the statute of Elizabeth, and " decreed the charity, *though before the statute no such decree could have been made(c)*."

It would seem, therefore, to have been the opinion of lord Nottingham, that an original bill would not, before the statute of Elizabeth, lie to establish a charity where the estate did not pass at law, to which the charitable uses attached. In Eyre *vs.* Shaftesbury(*d*), sir Joseph Jekyll said, in the course of his reasoning on another point, " in like manner, in the case of charity, the king, pro bono publico, has an original right to superintend the care thereof, so that, abstracted from the statute of Elizabeth relating to charitable uses, and *antecedent to it, as well as since*, it has been every day's practice to file informations in chancery in the attorney general's name, for the establishment of charities." In the Bailiffs, &c. of Burford *vs.* Lenthall(*e*), lord Hardwicke is reported to have said, " the courts have mixed the jurisdiction of bringing informations in the name of the attorney general, with the jurisdiction given them under the statute of Elizabeth, and proceed either way, according to their discretion." In a

---

(*a*) Attorney General *vs.* Newman, 1 Ch. Cas. 157. S. C. 1 Lev. 284. West *vs.* Knight, 1 Ch. Cas. 134. Anon. 1 Ch. Cas. 267. 2 Fonb. Eq. b. 3, pl. 2, ch. 1, s. 1. Parish of St Dunstan *vs.* Beauchamp, 1 Ch. Cas. 193.

(*b*) Attorney General *vs.* Newman, 1 Ch. Cas. 157.

(*c*) Anon. 1 Ch. Cas. 267.

(*d*) 2 P. Wms, 103, 118. Cited also, 7 Ves. Jun. 63, 87.

(*e*) 2 Atk. 550, 1743.

subsequent case(*a*), which was an information filed by the attorney general against the master and governors of a school, calling them to account in chancery, as having the general superintendency of all charitable donations, the same learned chancellor, in discussing the general jurisdiction of chancery on this head, and distinguishing the case before him from others, because the trustees or governors were invested with the visitatorial power; said, " consider the nature of the foundation; it is at the petition of two private persons, by charter of the crown, which distinguishes this case from cases of the statute of Elizabeth on charitable uses, *or cases before that statute, in which this court exercised jurisdiction of charities at large.*    Since that statute, where there is a charity for the particular purposes therein, and no charter given by the crown to found and regulate it, unless a particular exception out of the statute, it must be regulated by commission. But there may be a bill by information in this court, *founded on its general jurisdiction;* and that is from necessity, because there is no charter to regulate it, and the king has a general jurisdiction of this kind. There must be somewhere a power to regulate ; but where there is a charter with proper powers, there is no ground to come into this court to establish that charity; and it must be left to be regulated in the manner the charter has put it, or by the original rules of law.    Therefore, though I have often heard it said in this court, if an information is brought to establish a charity, and praying a particular relief and mode of regulation, and the party fails in that particular relief, yet that information is not to be dismissed, but there must be a decree for the establishment; that is, always with this distinction, *where it is a charity at large, or in its nature before the statute of charitable uses;* but not in the case of charities incorporated and established by the king's charter, under the great seal, which are established by proper authority allowed."    And again, " it is true, that an information in the name of the attorney general, as an officer of the crown, was not a head of the statute of charitable uses, *because that original jurisdic-*

---

(*a*) Attorney General *vs.* Middleton, (1751).   2 Ves. 327.

*tion was exercised in this court before; but that was always
in cases now provided for by that statute, that is, charities
at large, not properly and regularly provided for in charters
of the crown.*"

It was manifestly, therefore, the opinion of lord Hard-
wicke, that, independent of the statute of Elizabeth, the
court of chancery did exercise original jurisdiction in cases
of charities at large, which he explains to mean charities
not regulated by charter; but it does not appear that
his attention was called to discriminate between such as
could take effect at law, by reason of the interposition of a
feoffee or devisee capable of taking, and those where the pur-
pose was *general charity*, without the interposition of any
trust to carry it into effect; and the same remark applies to
the dictum by sir Joseph Jekyll. In a still later case(a),
which was an information to establish a charity and aid a
conveyance in remainder to *certain officers* of Christ's col-
lege to certain charitable uses, lord keeper Henley (after-
wards lord Northington) is reported to have said, " the
conveyance is admitted to be defective, the use being limited
to certain officers of the corporation, and not to the corpo-
rate body; and therefore there is a want of proper persons
to take in perpetual succession. The only doubt is, whether
the court shall supply this defect for the benefit of the cha-
rity *under the statute of Elizabeth*. And I take the uniform
rule of this court, *before, at* and *after* the statute of Eliza-
beth, to have been, that where the uses are charitable, and
the person has in himself full power to convey, *the court will
aid a defective conveyance to such uses.* Thus, though de-
vises to corporations were void under the statute of Henry
VIII., yet they were always considered as good in equity, if
given to charitable uses." And he then proceeds to declare,
that he is obliged, by the uniform course of precedents, to
assist this conveyance. and therefore establishes *the convey-
ance expressly under the statute of Elizabeth.*

There is some reason to question, if the language here im-

(a) Attorney General *vs.* Tancred, 1 W. Bl. 90. S.C. Ambler, 351. 1 Eden's
R. 10.

puted to lord Northington be minutely accurate. His lordship manifestly aids the conveyance, as a charity, *in virtue* of the statute of Elizabeth; and there is no doubt that it has been the constant practice of the court since that statute, to aid defects in conveyances to charitable uses. But there is no case in which such defects were aided before that statute. The old cases, though arising before, were deemed to be within the reach of that statute, by its retrospective language, and expressly decided on that ground(*a*). And the very case put of devises to corporations, which are void under the statute of Henry VIII., and are held good solely by the statute of Elizabeth, shows that his lordship was looking to that statute; for it is plain, that a devise, void by statute, cannot be made good upon any principles of general law. What therefore is supposed to have been stated by him as being the practice *before* the statute, is probably founded in the mistake of the reporter. The same case is reported in Ambler, 351, where the language is, " the constant rule of the court has always been, where a person has a power to give, and makes a defective conveyance to charitable uses, to supply it as an appointment; as in Jesus' college, Collinson's case in Hobart, 136." Now Collinson's case was expressly held to be sustainable, only as an appointment, under the statute of Elizabeth; and this shows that the language is limited to cases governed by that statute.

In a very recent charity case, sir Arthur Piggott in argument said, " the difference between the case of individuals and that of charities, is founded on a principle which has been established ever since the statute of charitable uses, in the reign of Elizabeth, and has been constantly acted upon from those days to the present;" and lord Eldon adopted the remark, and said, " I am fully satisfied as to all the principles laid down in the course of this argument, and accede to them all." His lordship then proceeds to discuss the most material of the principles and cases from the time of Elizabeth, and

(*a*) Collinson's Case, Hob. 136, S. C. Moore, 888. Moore 822. Sir Thomas Middleton's Case, Moore, 889. Rivett's Case, Moore, 890, and the cases cited in Raithby's note to Attorney General *vs.* Rye, 2 Vern. 453. Duke, 74, 77, 83, 84. Bridg. Charit. 366, 379, 380, 370. Duke, 105 to 113.

builds his reasoning, as indeed he had built it before, upon the supposition that the doctrine in chancery, as now established, rested mainly on that statute(*a*).   And his lordship's opinion, in the case alluded to(*b*), when commenting on Porter's case, is entitled to the more weight, because it seems to have been given after a very careful examination of the whole judicial history of charities.

These are all the cases which the researches of the court and of counsel have enabled them to find, where the jurisdiction of chancery over charities antecedent to the statute of Elizabeth has been directly or incidentally discussed.  The circumstance that no cases prior to that time can be found in equity; the tradition that has passed down to our own times, that original bills to establish charities were first entertained in the time of lord Ellesmere ; and the fact that the cases immediately succeeding that statute, where devises, void at law, were held good as charities, might have been argued and sustained upon the general jurisdiction of the court, if it existed, and yet were exclusively argued and decreed upon the footing of that statute ; do certainly afford a very strong presumption that the jurisdiction of the court to enforce charities, where no trust was interposed, and where no devisee was in esse, or where the charity was general and indefinite both as to persons and objects, mainly rests upon constructions (whether ill or well founded is now of no consequence) of that statute.

It is very certain, also, that since the statute of Elizabeth, no bequests are deemed within the authority of chancery to establish and regulate, except bequests for those purposes which that statute enumerates as charitable, or which, by analogies, are deemed within its spirit and intendment.   A bequest may be in an enlarged sense charitable, and yet not within the purview of the statute.   Charity, as the master of the rolls has justly observed, in its widest sense, denotes all the good affection men ought to bear towards each other ; in its more restricted and common sense, relief to the poor..

(*a*) Mills *vs.* Farmer, 1 Merivale, 55, 86, 94, 100.  Moggridge *vs.* Thackwell, 7 Ves. 36.  Attorney General *vs.* Bowyer, 3 Ves. 714, 726.

(*b*) Attorney General *vs.* Bowyer, 3 Ves. 714, 726.

In neither of these senses is it employed in the court of chancery(*a*). In that court it means such only as are within the letter and the spirit of the statute of Elizabeth; and therefore, where a testatrix bequeathed the residue of her personal estate to the bishop of D. to dispose of the same " to such objects of *benevolence and liberality* as the bishop in his own discretion shall most approve of," and appointed the bishop her executor; on a bill to establish the will and declare the residuary bequest void, the court held the bequest void upon the ground that objects of benevolence and liberality were not necessarily charitable within the statute of Elizabeth, and were therefore too indefinite to be executed. The court further declared, that no case had yet been decided in which the court had executed a charitable purpose, unless the will contained a description of that which the law acknowledges a charitable purpose, or devoted the property to purposes of charity in general, in the sense in which that word is used in the court. That the case was therefore the case of a trust of so indefinite a nature, that it could not be under the control of the court, so that the administration of it could be reviewed by the court, or if the trustee died, the court itself could execute the trust. That it fell therefore within the rule of the court that where a trust is ineffectually declared, or fails, or becomes incapable of taking effect, the party taking shall be a trustee, if not for those who were to take by the will, for those who take under the disposition of the law; and the residue was accordingly decreed to the next of kin.

So that it appears, since the statute of Elizabeth, the court of chancery will not establish any trusts for indefinite purposes of a benevolent nature, not charitable within the purview of that statute, although there be an existing trustee in whom it is vested; but will declare the trust void, and distribute the property among the next of kin : and yet, if there was an original jurisdiction in chancery over all be-

(*o*) Morice *vs.* Bishop of Durham, 9 Ves. 399. S. C. 10 Ves. 522. Brown *vs.* Yeall, 7 Ves. 59, note (*a*). Moggridge *vs.* Thackwell, 7 Ves. 36. Attorney General *vs.* Bowyer, 3 Ves. 714, 726. Cox *vs.* Basset, 3 Ves. 155.

quests charitable in their own nature, and not superstitious, to establish and regulate them, independent of the statute, it is not easy to perceive why an original bill might not be sustained in such court to establish such bequest, especially where a trustee is interposed to effectuate it; for the statute does not contain any prohibition of such bequests. An argument may therefore be fairly drawn from this source against a general jurisdiction in chancery over charities of an indefinite nature prior to the statute.

And the statute itself may be resorted to as affording an additional argument in corroboration of the opinion already expressed. It begins by a recital that lands, goods, money, &c. &c. had been given, &c. heretofore to certain purposes, which it enumerates in detail, which lands, &c. had not been employed according to the charitable intent of the givers and founders, by reason of frauds, breaches of trusts, and negligence in those that should pay, deliver, and employ the same. It then enacts, that it shall be lawful for the lord chancellor, &c. to award commissions under the great seal to proper persons to inquire, by juries, of all and singular such gifts, &c. breaches of trusts, &c. in respect to such gifts, &c. *heretofore* given, &c. or which shall hereafter be given, &c. " to or for any, the charitable and godly uses before rehearsed ;" and upon such inquiry, to set down such orders, judgments and decrees, as the lands, &c. may be duly and faithfully employed to and for such charitable uses before rehearsed, for which they were given; "which orders, judgments and decrees, not being contrary to the orders, statutes, or decrees of the donors or founders, shall stand firm and good according to the tenor and purpose thereof, and shall be executed accordingly, *until the same shall be undone and altered by the lord chancellor, &c. upon complaint by any party grieved, to be made to them.*" Then follow several provisions, excepting certain cases from the operation of the statute, which are not now material to be considered. The statute then directs the orders, &c. of the commissioners to be returned under seal into the court of chancery, &c. and declares that the lord chancellor, &c. shall, and may " *take such order for the due execution of all*

or any of the said judgments, orders and decrees, as to them
shall seem fit and convenient;" and lastly, the statute enacts
that any person aggrieved with any such orders, &c. may
complain to the lord chancellor, &c. for redress therein;
and upon such complaint the lord chancellor, &c. may, by
such course as to their wisdom shall seem meetest, the cir-
cumstances of the case considered, proceed to the examina-
tion, hearing and determining thereof; " and upon hearing
thereof, shall and may annul, diminish, alter, or enlarge the
said orders, judgments, and decrees of the said commis-
sioners as to them shall be thought to stand with equity and
good conscience, according to the true intent and meaning
of the donors and founders thereof;" and may tax and award
costs against the persons complaining with just and suffi-
cient cause of the orders, judgments, and decrees before
mentioned.(a)

From this summary statement of the contents of the sta-
tute, it is apparent that the authority conferred on the court
of chancery in relation to charitable uses is very extensive;
and it is not at all wonderful, considering the religious no-
tions of the times, that the statute should have received the
most liberal, not to say in some instances the most extrava-
gant, interpretation. And it is very easy to perceive how it
came to pass, that as power was given to the court in the
most unlimited terms to annul, diminish, alter or enlarge
the orders and decrees of the commissioners, and to sustain
an original bill in favour of any party grieved by such order
or decree, the court arrived at the conclusion that it might
by original bill do that in the first instance, which it cer-
tainly could do circuitously upon the commission(b). And,
as in some cases, where the trust was for a definite object,
and the trustee living, the court might, upon its ordinary
jurisdiction over trusts, compel an execution of it by an ori-

(a) See the statute 43 Eliz. ch. 4, at large, 2 Inst. 707. Bridg. on Duke, Char.
ch. 1, pl. 1.
(b) See the Poor of St Dunstan vs. Beauchamp, 1 Cha. Cas. 193. 2 Inst. 711.
Bailiffs, &c. of Burford vs. Lenthall, 2 Atk. 551. 15 Ves. 305.

ginal bill, independent of the statute($a$), we are at once let into the origin of the practice of mixing up the jurisdiction by original bill with the jurisdiction under the statute, which lord Hardwicke alluded to in the passage already quoted($b$), and which at that time was inveterately established. And this mixture of the jurisdictions serves also to illustrate the remark of lord Nottingham in the case already cited($c$); where, upon an original bill, he decreed a devise to charity, void at law, to be good in equity as an appointment, though before the statute of Elizabeth no such decree could have been made.

Upon the whole, it seems to me that the jurisdiction of the court of chancery over charities, where no trust is interposed, or there is no person in esse capable of taking, or where the charity is of an indefinite nature, is not to be referred to the general jurisdiction of that court, but sprung up after the statute of Elizabeth, and rests mainly on its provisions($d$). This opinion is supported by the weight of authorities speaking to the point, and particularly by those of a very recent date, which appear to have been most thoroughly considered. The language too of the statute lends a confirmation to the opinion, and enables us to trace what would otherwise seem a strange anomaly to a legitimate origin. If so, there is no pretence that by the law of Virginia, at the period when this will took effect, the statute of Elizabeth was then in force; or that any court of equity of that state could sustain the bequest in equity as a charity; if it was void at law. And that it was void at law, cannot be seriously doubted; for the legatees were not then a corporate society capable of taking it($e$); and it is a maxim that the legacy must take effect at the death of the testator,

($a$) Attorney General *vs.* Dixie, 13 Ves. 519. Kirkby Ravensworth Hospital, 15 Ves. 305. Green *vs.* Rutherforth, 1 Ves. 462. Attorney General *vs.* Earl of Clarendon, 17 Ves. 491, 499. 2 Fonb. Eq. b. 63, pl. 2, ch. 1, s. 1, note (*a*). Cooper's Eq. Pl. 292.

($b$) Bailiffs, &c. of Burford *vs.* Lenthall, 2 Atk. 550.

($c$) Anon. 1 Ch. Cas. 267.

($d$) See Cooper Eq. pl. 102, 103.

($e$) Com. Dig. Devise, K. 1 Roll. Abridg. 609. Com. Dig. Chancery, 2, N. 1, &c.

or be void at that time, and the right vest in another(*a*). And if a court of chancery could not in virtue of its general jurisdiction take cognizance of, or sustain the bequest in this suit, neither can the circuit court of the United States.

If we could surmount the objection already considered, that this bequest is under the present law of Virginia deemed void both in law and equity, and therefore incapable of being decreed by this court, we might entertain the other questions which have been made in this court. One of these questions is, whether this court, as a court of equity, has a right to administer any charities, the administration of which would properly belong to the government of Virginia as parens patriæ. It is certainly stated in books of authority, that the king, as parens patriæ, has the general superintendence of all charities not regulated by charter(*b*), which he exercises by the keeper of his conscience, the chancellor; and therefore the attorney general, at the relation of some informant, when it is necessary, files, ex officio, an information in the court of chancery to have the charity properly established. And it is added, that the jurisdiction thus exercised does not belong to the court of chancery as *a court of equity,* but *as administering the prerogative and duties of the crown*(*c*). It may be safely admitted that the government of a state, as parens patriæ, has a right to enforce all charities of a public nature, by virtue of its general superintending authority over the public interests, where no other person is entrusted with it; and it seems also to be held, that the jurisdiction vested by the statute of Elizabeth over charitable uses is personal to the lord chancellor, and not in his ordinary or extraordinary jurisdiction in chancery, like that, in short, which he exercises as to lunatics and idiots(*d*).

(*a*) Per Lord Hardwicke, Widmore *vs.* Woodroffe, Ambler, 636, 640.

(*b*) 3 Bl. Comm. 427.   2 Fonb. Eq. b. 2, pl. 2, ch. 1, s. 1, and note (*a*).

(*c*) Cooper's Eq. Pl. xxvii.   2 Fonb. Eq. b. 2, pl. 2, ch. 1, s. 1.   Lord Falkland *vs.* Bertie, 2 Vern. 342.   Mitf. Pl. 29.   Bailiffs, &c. of Burford *vs.* Lenthall, 2 Atk. 551.

(*d*) Bailiffs of Burford *vs.* Lenthall, 2 Atk. 551.   2 Fonb. Eq. b. 3, pl. 2, ch. 1, s. 1, and note (*a*).

It may also be admitted, that where money is given to charity generally and indefinitely, without trustees or objects selected, the king, as parens patriæ, is the constitutional trustee, and may apply it as he pleases under his sign manual, and not under a decree of chancery(a). Where, however, the execution is to be by a trustee with general or some objects pointed out, or to a trustee for indefinite and general charity, the court of chancery will take the administration of the trust(b). Whether in such a case upon *an original bill* to establish the charity, the lord chancellor acts as the personal delegate of the crown, administering its prerogative in analogy to the authority *personally* given to him by the statute of charitable uses under a commission; or whether as a court of equity in virtue of its general powers, may perhaps upon the authorities admit of some question; though my opinion is that it belongs to the court, as a court of equity, exercising jurisdiction to enforce a *trust* recognized and enforced by the law of the land; and I think this opinion is corroborated by the better authorities(c). Be this as it may, where there is a *trust* for a *definite* object, and the trust is in point of law sustainable, there seems no reason why a court of equity, as such, may not take cognizance of such trust at the suit of any competent party, whether the attorney general, or a private interested relator, as well as of any other trust whose execution is sought(d). If therefore by the law of Virginia the bequest in this case had been valid in law or equity, the trustees being marked out, and the objects being definite, there does not seem any reason why at their instance it might not have been exe-

(a) Moggridge *vs.* Thackwell, 7 Ves. 36, 83, 85, 86. Mills *vs.* Farmer, 1 Merivale, 55. Paice *vs.* Archbishop of Canterbury, 14 Ves. 364. Attorney General *vs.* Mathews, 2 Lev. 167.

(b) Moggridge *vs.* Thackwell, 7 Ves. 36, 86. Mills *vs.* Farmer, 1 Merivale, 55.

(c) Id. and Paice *vs.* Archbishop of Canterbury, 14 Ves. 364. Attorney General *vs.* Wansay, 15 Ves. 231. Attorney General *vs.* Price, 17 Ves. 371. Waldo *vs.* Caley, 16 Ves. 206.

(d) 2 Fonb. Eq. b. 3, pl. 2, ch. 1, s. 1, note (a), s. 2, s. 3, note (i). Moggridge *vs.* Thackwell, 7 Ves. 36. Attorney General *vs.* Brewer's Company, 1 Merivale, 495. Attorney General *vs.* Bowyer, 3 Ves. 714. 2 Vern. 387. Attorney General *vs.* Newcomb, 14 Ves. 1, 7. White *vs.* White, 7 Ves. 423.

cuted in this as well as in any other court of equity. The court in such a case would carry into effect the intention of the testator; nothing would be left to its discretion; and it would therefore do precisely what a state court of chancery must do, acting as such, or administering the prerogative of the government as parens patriæ.

In respect to another question, whether the attorney general be not a necessary party to a bill in equity to establish a charity or carry it into effect, that must depend upon circumstances. If the charity be indefinite, or there be no trustees, or no persons competent to take, or the objects be of a general and public nature, it would clearly be proper that the government to whom the superintendency of such charities belongs, should be made a party to the bill by their attorney general. This seems to have been the general course established by the authorities(a). But 'where the charity is definite in its nature, and trustees are appointed to take or execute it, it is not perceived why a suit at the instance of such trustees may not properly be maintained without the government being a party(b).

Another question which has been discussed in the argument is, whether a court of equity sitting within one jurisdiction, can execute any charitable bequests for foreign objects in another jurisdiction; and it is said, in a technical sense, to be against the public policy of Virginia to sustain or execute such bequests. There is no statute of Virginia making such bequests void; and therefore, if against her policy, it can be only because it would be against the general policy of all states governed by the common law. The case of the Attorney General vs. The City of London(c), is relied on to establish the general proposition. It was an in-

(a) Cooper's Eq. Plead. 21, 22, 102, 163. Monill vs. Lawson, 2 Eq. Cas. Abr. 167, pl. 13. 4 Vin. 500, pl. 11. Attorney General vs. Pearse, 2 Atk. 87.

(b) Monill vs. Lawson, 2 Eq. Cas. Abridg. 167, pl. 13. 4 Vin. 500, pl. 11. Bridg. Duke, Charit. 385, 386. Chitty vs. Parker, 4 Bro. Ch. Cas. 38. Anon. 3 Atk. 276. Attorney General vs. Newcomb, 14 Ves. 1, 7. Waldo vs. Caley, 16 Ves. 206.

(c) 3 Bro. Ch. Cas. 171. S. C. 1 Ves. Jun. 243. Provost, &c. of Edinburgh vs. Aubury, Ambler, 236. Oliphant vs. Hendrie, 1 Bro. Ch. Cas. 571.

rormation to establish a new scheme for a charity of Mr Boyle, who by his will in 1691 gave the residue of his fortune to be laid out by his executors for charitable and other pious and good uses, at their discretion, but recommended that the greater part should be laid out for the advancement of the christian religion among infidels. The charity had been established under a decree of the court, and the property conveyed to the city of London upon trust to lay out the rents and profits in the advancement of the christian religion, as the bishop of London, for the time being, and lord Burlington should appoint. The trustees appointed the rents and profits to be paid to an agent in London, for the college of William and Mary, in Virginia, for this purpose, that the college should maintain and educate in the christian religion so many Indian children, as far as the fund would go, and that the president, &c. thereof, should transmit accounts, and *should be subject to rules given them until altered.* This arrangement was ratified by the court. After the revolution, the present bill was filed for the purpose of taking away the charity from the college, because emancipated from the control of the court, and to have it disposed of by a new scheme. Upon hearing the cause a decree was made accordingly, upon the ground that the trusts to the college to convert neighbouring infidels ceasing for want of objects, (there being now, as the court said, no neighbouring infidels), the charity must be applied anew(*a*). There was also an intimation at the argument, that the corporation was not now an existing corporation, and at all events was not within the control of the court. But the ground of the decision was as above stated. It is observable in this case, that the charity of Mr Boyle was not in terms or substance limited to foreign countries or objects; but the application to foreign objects was originally under the decree of the court. It certainly then furnishes no argument against, but an argument in favour of the power of a court of equity, to apply even a *general* charity to *foreign* objects.

But we need not rest here. There are other cases directly

(*a*) 3 Bro. Ch. Cas. 171, 177.

in point, in which bequests for foreign charitable objects have been sustained in equity. In the Provost, &c. of Edinburgh *vs.* Aubury(*a*), there was a devise of three thousand five hundred pounds, south sea annuities, to the plaintiffs, to be applied to the maintenance of poor labourers residing in Edinburgh and the towns adjacent. Lord Hardwicke was of opinion, that he could not give any directions as to the distribution of the money, that belonging to another jurisdiction, that is, to some of the courts in Scotland; and therefore directed that the annuities should be transferred to such person as the plaintiffs should appoint, *to be applied to the trusts in the will.* So in Oliphant *vs.* Hendrie(*b*), where A. by will gave three hundred pounds to a religious society in Scotland, to be laid out in the purchase of heritable securities in Scotland, and the interest thereof to be applied to the education of twelve poor children, the court held it a good bequest. That case approaches very near to the case now at bar. In Campbell *vs.* Radnor(*c*), the court held a bequest of seven thousand pounds, to be laid out in the purchase of lands in Ireland, and the rents and profits distributed among poor persons in Ireland, &c. to be good and valid in law. In Curtis *vs.* Hutton(*d*), the court held a bequest of personal estate for the maintenance of a charity (a college) in Scotland, to be a valid bequest. In a still more recent case, a bequest of ten thousand pounds in trust with the magistrates of Inverness in Scotland, to apply the interest and income for the education of certain boys, was held a valid bequest(*e*). There is also another case(*f*), in which it was held that a legacy given towards establishing a bishop in America was held good, notwithstanding none was yet appointed; and the court directed the money to remain in court, until it should be seen whether any appointment should take place. Nor is the uniformity of the current of the authorities broken in upon by the doctrine

(*a*) Ambler, 236.
(*b*) 1 Bro. Ch. Cas. 571.
(*c*) 1 Bro. Ch. Cas. 171.
(*d*) 14 Ves. 537.
(*e*) Mackintosh *vs.* Townsend, 16 Ves. 330.
(*f*) Attorney General *vs.* Bishop of Chester, 1 Bro. Ch. Cas. 444.

in De Garcin vs. Lawson(a). There, the bequests were to Roman Catholic establishments, or for the benefit of Roman Catholic priests, and were considered void, because they were illegal and contrary to the policy of England, evinced by the express enactments of statutes on this subject(b). It does not strike me, therefore, that there is any solid objection to the bequest in the case at bar, founded on the persons or objects being foreign to the state of Virginia.

But for the reasons already stated, the bequest being void, I am of opinion that the court ought to certify that opinion to the circuit court of Virginia.

(a) 4 Ves. Jun. 433, note.
(b) Carey vs. Abbot, 7 Ves. Jun. 490. Highmore on Mortmain, 1809, p. 34; &c.